PHOENIX MUTUAL LIFE INSURANCE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 31993-87.     Filed March 26, 1991.

*Arthur L. Bailey, Gerald A. Kafka,* and *J. Walker Johnson,* for the petitioners.
*Diane D. Helfgott,* for the respondent.

## SUPPLEMENTAL FINDINGS OF FACT AND OPINION

WELLS, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the year ended December 31, 1980, in the amount of $6,223,612. The issues we consider in this supplemental opinion[1] are: (1) Whether a reserve set aside by petitioner for insureds who were eligible, under group term life insurance policies, for extended insurance coverage without further payment of premiums by reason of their disability, qualifies as a "life insurance reserve" under section 801(b),[2] (2) whether, in the context of group term life insurance policies, the portion of petitioner's reserves attributable to net deferred and uncollected premiums qualifies as a life insurance reserve under sections 801(b) and 818(a), and (3) whether a portion of the agents' commissions paid by petitioner with respect to ordinary life insurance policies may be treated as a general expense assigned to investment expenses under section 804(c)(1), and, if so, what portion.

## FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The stipulations and accompanying exhibits are incorporated in this opinion irrespective of any restatement below. When the petition in the instant case was filed, petitioner had its principal place of business in Hartford, Connecticut. Because the issues are complex, our remaining findings of fact and opinion are set forth below under separate headings for each issue.

---

[1]The issues decided in this supplemental opinion are the ones remaining after the issuance of our opinion reported at 96 T.C. 481 (1991).

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

*I. Reserve for Extended Insurance under Group Term Life Insurance Policies.*

FINDINGS OF FACT

Prior to and during the year in issue, petitioner issued group term life insurance policies to multiple-employer trusts (the trusts) (the memberships of which consisted of various employers) and to single employers. The policies insured the lives of each participating employee (hereinafter employee) of such employers during the period that the policy remained in force, and, in the case of trust policies, while the employer remained a participating member of the trust. The group term life insurance policies were for 1-year periods, and petitioner reserved the right to change the premium rates annually. Some of the policies could be discontinued by petitioner at the annual policy "anniversary" date upon the giving of 60 days' notice; other policies provided for termination by petitioner upon notice on any premium due date when there were less than a certain number or percentage of employees insured under the policies.

The policies contained special provisions for covered employees who became totally disabled and unable to work prior to reaching the age of 60. Under those provisions (denominated in the policies under the heading "Continuation of Insurance Provisions; Extended Insurance" and referred to herein as extended insurance provisions[3]), life insurance coverage would remain in effect beyond the term of the policy, without further payment of premiums, during the period of the employee's total disability. A typical extended insurance provision stated in relevant part:

EXTENDED INSURANCE: If, while insured by these Life Insurance Provisions and prior to his sixtieth birthday, an employee becomes and remains totally disabled from an injury or a sickness which completely prevents him from engaging in any work for remuneration or profit, his insurance will continue for one year after cessation of premium payments thereon. If the employee dies within such year, due proof of the uninterrupted existence of such disability until death must be furnished Phoenix Mutual within one year after death.

---

[3]Our use of the term "extended insurance" is not meant to have any substantive effect on the classification of the coverage as life versus health insurance.

If the employee has become totally disabled under the conditions stated above and furnishes Phoenix Mutual, within the year after cessation of premium payments, due proof that such disability has existed uninterruptedly for nine months (herein called "initial proof"), *his insurance will continue during the period of such disability,* subject to (a) annual submission of due proof of the uninterrupted existence of such disability within three months preceding each anniversary of receipt of initial proof, and (b) submission by the employee to examination by a physician, as provided below. However, *this continuance of insurance will terminate upon the earliest of* (a) cessation of total disability, or (b) failure to submit the required proof of the uninterrupted existence of total disability, or (c) failure to submit to examination by a physician, as provided below, in which event, the employee shall then be entitled to the Conversion Privilege just as if employment had then terminated, unless he returns to work for the Employer within the period allowed for conversion and is again insured by this policy. If the employee dies during this continuance of insurance, due proof must be furnished Phoenix Mutual within one year after death that such disability had existed uninterruptedly from the last anniversary of receipt of initial proof until death. [Emphasis supplied.[4]]

Thus, if a disabled employee covered by extended insurance died before having recovered from his disability, a death benefit would be paid by petitioner. Upon an employee's recovery from disability, however, extended insurance protection would terminate, and petitioner would not be liable to pay a death benefit with respect to such employee unless the employee were otherwise covered under one of petitioner's life insurance policies. Because the group policies which provided extended insurance were 1-year term policies, the employees covered by extended insurance at any particular time might be individuals whose employers no longer were insured with petitioner. The premiums charged by petitioner for group term policies that included extended insurance provisions were higher than the amounts charged under identical policies that did not include extended insurance provisions. Petitioner did not offer or sell extended insurance as an independent "contract" separate from its group term life insurance contracts.

During the year in issue, petitioner established and maintained a reserve for the extended insurance provisions covering employees that had become disabled, in addition to reserves for the basic death benefits under its group term

---

[4]The "Conversion Privilege" referred to in the extended insurance provision was a right on the part of the employee to obtain an *individual* life insurance policy from petitioner.

life insurance contracts. On its annual statement filed with the State of Connecticut for the year in issue, the reserve for extended insurance was denominated a "Disability-Disabled Lives" reserve (hereinafter referred to as the disabled lives reserve). The disabled lives reserve reflected a contingent liability for death benefit payments with respect to employees who had *already* become totally disabled as of the annual statement date, and was the actuarially determined amount necessary to satisfy future claims for such death benefits. The computation of the disabled lives reserve took into account factors such as the age at which each disabled employee became disabled, the duration of the disability as of the date of computation of the reserve, probabilities of death, and probabilities of recovery from disability.

On its Federal income tax return for the year in issue, petitioner reported the disabled lives reserve as a "life insurance reserve" under section 801(b). Respondent, in his notice of deficiency, determined that the disabled lives reserve did not qualify as a life insurance reserve, thereby increasing petitioner's taxable investment income.

## OPINION

The issue we must decide concerns section 801(b)(1)(B). Section 801(b) provides in relevant part:

SEC. 801(b). LIFE INSURANCE RESERVES DEFINED.—

(1) IN GENERAL.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

(2) RESERVES MUST BE REQUIRED BY LAW.— * * *

\*    \*    \*    \*    \*    \*    \*

in addition to the requirements set forth in paragraph (1), life insurance reserves must be required by law.

Respondent concedes that the disabled lives reserve was computed on the basis of recognized mortality or morbidity tables and assumed rates of interest, satisfying the requirements of section 801(b)(1)(A), and was required under Connecticut law, satisfying the requirements of section 801(b)(2). Respondent, however, asserts that the extended insurance provisions of petitioner's group term life insurance policies constituted *cancelable health insurance* under section 801(b)(1)(B), therefore preventing the disabled lives reserve from qualifying as a life insurance reserve. Petitioner apparently concedes that the extended insurance, if treated as health insurance, would not qualify as "noncancellable" under section 801(b)(1)(B), and that the disabled lives reserve therefore would fail to qualify as a life insurance reserve. See sec. 1.801-3, Income Tax Regs. Petitioner, however, argues that the extended insurance should not be treated as *health* insurance but as life insurance, rendering "cancellability" irrelevant[5] and qualifying the disabled lives reserve as a life insurance reserve under section 801(b). *Alinco Life Insurance Co. v. United States,* 178 Ct. Cl. 813, 373 F.2d 336, 348, 354 (1967). For the reasons discussed below, we agree with petitioner.

## Background

Before we turn to an evaluation of the parties' arguments, a brief discussion of life insurance reserves and of the historical treatment of reserves for extended insurance for disabled individuals is useful.

The term "reserve," when used in the life insurance context, has a different meaning than that ordinarily associated with the term. As one treatise states:

> The word "reserve" is somewhat misleading, since it does not have the same use here as in the usual commercial dealings * * * . The policy reserve of a life insurance company is a *liability*. It represents an *obligation* to the policyowners. * * * [S. Huebner & K. Black, Life Insurance 350 (10th ed. 1982); emphasis in original.]

---

[5]Compare *United Benefit Life Insurance Co. v. McCrory,* 414 F.2d 928 (8th Cir. 1969) (disabled lives reserve set aside with respect to waiver of premium provisions on cancelable *health and accident* insurance policies failed to qualify as "life insurance reserve"; onset of disability and indefinite continuation of policy during period of disability did not render contract "noncancellable" for purposes of sec. 801(b)(1)(B)).

Likewise, we have stated that life insurance reserves "are bookkeeping entries reflecting liabilities on the insurance company's books and *do not represent funds actually set aside in something like a trust fund.* * * * It is the company's surplus that actually protects the policyholders." *Anchor National Life v. Commissioner,* 93 T.C. 382, 419 n.25 (1989) (emphasis supplied). Similarly, the Third Circuit has noted that "contrary to generally held belief, 'reserves' are not trust funds or assets in escrow but are factually and merely statements of liability." *Mutual Benefit Life Insurance Co. v. Commissioner,* 488 F.2d 1101, 1103 (3d Cir. 1974). The amount of a life insurance reserve has been described, in general terms, as "the difference, at any point in time, between the present value of future benefits and the present value of future net premiums." S. Huebner & K. Black, *supra* at 349; *USAA Life Insurance Co. v. Commissioner,* 94 T.C. 499, 504 (1990).[6]

A reserve for extended insurance for disabled individuals provided under a life insurance policy reflects the company's increased potential liability for *death benefits* resulting from the disability of an individual covered by extended insurance. See *Group Life & Health Insurance Co. v. United States,* 78-2 USTC par. 9797, 42 AFTR 2d 78-6282 (N.D. Tex. 1978), revd. on other grounds 660 F.2d 1042 (5th Cir. 1981). The amount of such reserve reflects the fact that no future premiums are to be received for the covered individual and also reflects the prospect of earlier deaths among the disabled. *Group Life & Health Insurance Co. v. United States, supra.*

Life insurance provisions providing extended insurance coverage to disabled individuals without payment of premiums also are sometimes referred to as "waiver of premium" provisions. See D. Gregg, Group Life Insurance 73, 75 (3d ed. 1973); *Aetna Life Insurance Co. v. United States,* 16 Cl. Ct. 364, 374-375 (1989). Petitioner argues that its extended

---

[6]In general terms, the "net premium," or "net valuation premium," is the portion of the gross premium charged by the insurance company which, when accumulated at interest, is designed to meet the payment of insurance benefits. The other portion of the gross premium is the "loading" portion, which is used to pay other expenses of the insurance company and to provide a profit and potential source of dividends for the company. S. Huebner & K. Black, Life Insurance 364, 368 (10th ed. 1982); *Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148 (1977); *Anchor National Life Insurance Co. v. Commissioner,* 93 T.C. 382, 419 (1989).

insurance provisions should not be equated with "waiver of premium" provisions on individual life insurance policies because, in the context of 1-year group term insurance, no future premiums are "due" under the original policy, and the insurance company does not pay the waived premiums to itself, as in the case of waiver of premium provisions on individual life insurance. The expert report submitted by petitioner describes the different accounting and actuarial treatment of the two types of provisions as well as the differences in benefits to policyholders. In the instant case, we need not decide whether reserves for waiver of premium provisions on individual life insurance policies might be treated differently than the disabled lives reserve. Cf. *Aetna Life Insurance Co. v. United States, supra* (concluding that continued coverage in the context of group term life insurance is indistinguishable from waiver of premium benefits in individual policies). Our references to cases involving such reserves are not meant to convey any opinion on such issue; however, as discussed below, we believe that those cases are relevant by way of background and in evaluating respondent's argument concerning the legislative history of section 801(b)(1)(B). We also note that in *Group Life & Health Insurance Co. v. Commissioner, supra,* the District and Circuit Courts referred to the relevant provisions under the group term life insurance policies there in question as "waiver of premium" benefits.

Reserves related to waiver of premium provisions received judicial attention around 1940. The issue in those early controversies involved the requirement that an amount relate to future *"unaccrued"* claims involving "contingencies" in order to qualify for deductibility as an insurance "reserve," a requirement stemming from the Supreme Court's opinion in *Maryland Casualty Co. v. United States,* 251 U.S. 342 (1920). See Guadiana, "Federal Income Taxation of Life Insurance Companies: The Life Insurance Reserve," 30 Tax L. Rev. 173 (1975); T. Nash, Federal Taxation of Life Insurance Companies 8-31 to 8-32 (1983). The Government's position was that reserves for waiver of premium provisions did not qualify as insurance reserves because the relevant claims already had *accrued* or matured. That position stemmed from the fact that, as in the instant

case, the amounts were set aside and computed on the basis of the insureds who had *already* become disabled. In *Monarch Life Insurance Co. v. Commissioner,* 38 B.T.A. 716 (1938), affd. 114 F.2d 314 (1st Cir. 1940), the First Circuit explained its rejection of the Government's argument as follows:

> The Commissioner contends that this is not a technical insurance reserve because, he says, it is maintained to pay claims which have already accrued or matured.
>
>     *        *        *        *        *        *        *
>
> The claim is not accrued because, though the disability has been incurred, *the continuance of the disability is uncertain,* and thus the waiver is contingent. The extent of the probable liability and the amount of the reserve created are fixed by reference to mortality and disability tables plus an assumed interest rate. * * * It is clear that the reserve is held by the taxpayer against claims of insurance that are "future," "unaccrued," and "contingent." * * *
> [114 F.2d at 320; emphasis supplied].

The Supreme Court agreed with such analysis and invalidated regulations which excluded from "reserves" amounts representing the "estimated value of future premiums which have been waived on policies after proof of total and permanent disability."[7] *Helvering v. Oregon Mutual Life Insurance Co.,* 311 U.S. 267 (1940). See *Aetna Life Insurance Co. v. United States, supra* at 376 n.21. The Supreme Court reasoned that the liability to protect "those who have incurred disability is not a fixed sum, but remains a contingency, still uncertain in duration and amount." *Helvering v. Oregon Mutual Life Insurance Co., supra* at 271-272.

In 1970, the Internal Revenue Service ruled that the holdings in *Monarch Life* and *Oregon Mutual* are of continuing vitality under section 801(b), and that, under the authority of those cases, a disabled lives reserve is "maintained to pay future *unaccrued* claims" and qualifies as a "life insurance reserve" where required by law and computed on the basis of recognized mortality or morbidity tables of assumed rates of interest. Rev. Rul. 70-190, 1970-1

---

[7] Art. 203(a)(2)-1 of Regulations 86 (1935).

C.B. 150.[8] The facts of Revenue Ruling 70-190 involved life insurance contracts which provided disabled individuals with both waiver of premium benefits and monthly disability *income* benefits; the ruling, however, drew no distinction between the two types of benefit and failed to consider whether either benefit might constitute "health insurance" subject to the noncancelability requirement of section 801(b)(1)(B).

In 1980, the Internal Revenue Service "clarified" Revenue Ruling 70-190 by stating that the "health and accident benefits" involved therein "were, in effect, noncancellable." Rev. Rul. 80-115, 1980-1 C.B. 138. Revenue Ruling 80-115 itself involved 1-year group term life insurance contracts under which permanently disabled employees were entitled to monthly disability *income* benefits, as opposed to extended insurance/premium waiver benefits; the ruling held that the reserve maintained to fund such disability income benefits did not qualify as a "life insurance reserve" because it was a reserve for *cancelable* health insurance. The ruling relied on *United Benefit Life Insurance Company v. McCrory*, 414 F.2d 928 (8th Cir. 1969), discussed *supra* note 5 and *infra* note 25. In the instant case, petitioner has conceded that its reserves held for disability *income* benefits on certain contracts do not qualify as life insurance reserves.[9] Revenue Ruling 80-115 did not address directly the treatment of extended insurance or waiver of premium provisions as health insurance.

## The Parties' Arguments

### Extended Insurance as Health versus Life Insurance

Respondent makes two arguments on brief in support of his position that the disabled lives reserve does not qualify as a life insurance reserve. First respondent argues that extended insurance is *health insurance* for purposes of section 801(b)(1)(B) because it provides a *current* economic benefit to the disabled employee and is equivalent to the receipt of disability *income* payments by such employee

---

[8]It is noted that rulings of the Internal Revenue Service do not constitute binding authority in this Court. *Stark v. Commissioner,* 86 T.C. 243, 250-251 (1986).

[9]The sample contracts submitted in evidence in the instant case also included separate "Accident and Sickness Insurance Provisions" not at issue.

followed by the use of the cash to pay life insurance premiums. Petitioner counters by arguing that the only benefit actually payable under the extended insurance provisions is a *death* benefit, and that the extended insurance provisions merely serve to extend basic death benefit coverage.

Respondent cites a variety of treatises for the proposition that waiver of premium provisions are a type of "disability benefit." Petitioner offers citations of its own referring to the benefits as "extension(s) of *life insurance*," and stating that extended insurance provisions keep life insurance alive and provide a "benefit" only in the event of death.

That the extended insurance provisions "benefit" disabled employees is clear, as that is the purpose for which they are designed. As the Claims Court noted in *Aetna Life Insurance Co. v. United States,* 16 Cl. Ct. 364, 377 (1989), however, labeling the provisions a disability benefit "simply begs the question"; what we must decide is whether the limitation of such benefit to disabled individuals prevents the associated reserve from qualifying as a life insurance reserve under section 801(b)(1)(B). We therefore turn to the language of section 801(b)(1)(B) and its prior interpretations.

In interpreting section 801(b)(1)(B), we believe that the words "life insurance" and "health insurance" should not be read in isolation. Rather, they should be read in the context in which they appear. The operative language of section 801(b)(1)(B) describes "life insurance reserves" as amounts:

which are set aside *to mature or liquidate,* either by *payment* or reinsurance, future unaccrued *claims* arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) * * * [Emphasis supplied.]

Thus, qualification of a reserve as a "life insurance reserve" depends upon the nature of the claim which the reserve is set aside *to pay.* Compare *Modern American Life Insurance Co. v. Commissioner,* 92 T.C. 1230 (1989) (reserve set aside for the payment of policyholder dividends is not a "life insurance reserve"). In the instant case, the only obligations which petitioner could be held liable *to pay* under extended insurance were the death benefits for disabled employees who died during the period of extended coverage; the

disabled lives reserve was equal to the present value of such death benefits. Thus, a plain reading of the statute suggests that the disabled lives reserve qualifies as a life insurance reserve. See *USAA Life Insurance Co. v. Commissioner,* 94 T.C. 499, 533 (1990) ("Anticipated death benefits prior to the death of the insured are clearly 'future unaccrued claims' for purposes of section 801(b)(1)(B)").

The only other court to have addressed the "health versus life insurance" issue is the Claims Court in *Aetna Life Insurance Co. v. United States, supra.* Both parties agree that *Aetna* presents the identical issue involved in the instant case. The Claims Court, describing the issue as "novel" and lacking "any significant authority on behalf of either side" (16 Cl. Ct. at 376, 377), focused on the event necessary to trigger reduction of a reserve, and concluded that the disabled lives reserve was a life insurance reserve "since any *payment* will be due only upon a disabled employee's death." (16 Cl. Ct. at 378; emphasis supplied.)[10] We believe that the Claims Court's analysis in *Aetna* comports with a plain reading of section 801(b)(1)(B). We also believe that respondent's argument equating the extended insurance with the receipt of income by the disabled employees ignores economic reality. The extended insurance never provided that disabled employees had any right to the *current* use of any funds from petitioner, and petitioner never was liable for *any* payment with respect to the extended insurance except the proceeds of the policy if *death* occurred before an employee recovered from his or her disability. The Court of Claims' discussion of the fundamental difference between health and life insurance in *New World Life Insurance Co. v. United States,* 88 Ct. Cl. 405, 26 F. Supp. 444 (1939), affd. on another issue 311 U.S. 620 (1940), provides a useful analytical framework:

The purpose of considering the mortality element * * * in casualty insurance is the opposite of that of the reserve for the life risk in a life

---

[10]The taxpayer in *Aetna Life Insurance Co. v. United States,* 16 Cl. Ct. 364 (1989), maintained a separate "active lives" reserve for the extended insurance provision being considered, in addition to a disabled lives reserve. Because the active lives reserve was *reduced* when an employee became disabled (by way of a transfer to the disabled lives reserve), the Claims Court found the active lives reserve to be a cancelable health insurance reserve. In the instant case, petitioner apparently did not maintain a separate active lives reserve for extended insurance, and the parties focus their arguments solely on the Claims Court's treatment of the disabled lives reserve.

insurance policy. The mortality element in a life policy requires the establishment of a reserve sufficient to meet the policy obligations at maturity; that is, at death. *In the case of health and accident insurance death, instead of maturing the liability, terminates the risk with respect to the payment of liability for disability benefits.* [26 F. Supp. at 464; emphasis supplied.[11]]

In the instant case, the death of an employee did not *"terminate"* petitioner's risk of having to make payment; instead, it *triggered* petitioner's liability for payment.

The opinions of the District Court and the Fifth Circuit in *Group Life & Health Insurance Co. v. United States,* 78-2 USTC par. 9797, 42 AFTR 2d 78-6282 (N.D. Tex. 1978), revd. and remanded 660 F.2d 1042 (5th Cir. 1981), also indicate that reserves for extended insurance provisions (referred to in those opinions as "waiver of premium" benefits) of group term life insurance policies may qualify as life insurance reserves under section 801(b)(1)(B). In that regard, the District Court found that:

The disabled insured's life expectancy is substantially shorter than a normal, healthy insured. Although an amount is included in the basic life reserve for the underlying life policy, the Reserve for Disability-Disabled Lives is set up to recognize that a liability exists for a risk which is far greater than the risk recognized under the basic policy. The assumption is that since the individual is totally disabled, there is a very good chance that the insurance company is going to incur a claim on that individual in the near future. * * * The Disability-Disabled Lives Reserve is a reserve that needs to be established to properly reflect Group Life's liability with respect to increased exposure as a result of disabled policyholders and, therefore, is an amount under Sec. 801(b) which is set aside to mature or liquidate future unaccrued claims arising from life polices. [78-2 USTC at 85,692, 42 AFTR 2d at 78-6287.]

On appeal, the Fifth Circuit, reversing the District Court, held that the reserve in question failed the requirements of section 801(b)(1)(A), because it was computed by setting aside a flat $750 for every $1,000 of insurance in force rather than being based on "recognized mortality or morbidity tables and assumed rates of interest." However, the

---

[11]In *Helvering v. Oregon Mutual Life Insurance Co.,* 311 U.S. 267 (1940), the Supreme Court disagreed with the holding of *New World Life Insurance Co. v. United States,* 88 Ct. Cl. 405, 26 F. Supp. 444 (1939), that reserve funds "required by law" under sec. 203(a)(2) of the Revenue Acts of 1928 and 1932 included only reserves held on account of life insurance and annuity contracts, and not health insurance reserves. See *infra* p. 515. The Supreme Court did not, however, disagree with the quoted description of the difference between life and casualty insurance.

Court indicated that it was "undisputed" that a "disability-disabled lives" reserve otherwise might qualify as a life insurance reserve (660 F.2d at 1056[12]), and described such reserves as designed to meet "the prospect of earlier *deaths* among the disabled." *Group Life & Health Insurance Co. v. United States,* 660 F.2d at 1049 (emphasis supplied). Thus, although the Fifth Circuit disqualified the reserve there in issue, its opinion suggests that petitioner's disabled lives reserve in the instant case—which respondent concedes is computed on the basis of the appropriate tables and interest rates—would qualify as a life insurance reserve. See *UNUM Life Insurance Co. v. United States,* 897 F.2d 599, 609 (1st Cir. 1990) (comparing results in *Group Life & Health Insurance Co., supra,* and *Aetna Life Insurance Co. v. United States, supra,* based on use of recognized mortality table in the latter case).

Previous cases involving the application of section 801(b) to other types of reserves support our conclusion that the disabled lives reserve is a "life insurance reserve." In *Union Mutual Life Insurance Co. v. United States,* 570 F.2d 382 (1st Cir. 1978), an insurance company issued life insurance policies which included a "guaranteed insurability" rider option under which policyholders could acquire specified additional amounts of insurance without having to present evidence of current insurability (i.e., by passing a medical examination). In addition to its basic death benefit reserves for the policies, the insurance company maintained an additional reserve for the unexercised guaranteed insurability options. The Government contended that such additional reserve was not a "life insurance reserve" because it related to policies which might be issued in the future, rather than life contingencies in existing life insurance policies. The First Circuit disagreed, stating that:

The Government fails to recognize that the [guaranteed insurability] option is one of the insurance protections afforded by the very insurance policy initially issued to the policyholder. The policyholder not only is given coverage for the face amount of his current policy but also is guaranteed the option to elect additional coverage at certain specified dates in the future. Thus, we do not think these reserves should fail to

---

[12]Citing *Commissioner v. Monarch Life Insurance Co.,* 114 F.2d 314 (1st Cir. 1940), and Rev. Rul. 70-190, 1970-1 C.B. 150 (discussed *supra* pp. 505-506).

qualify on the asserted ground that they are not maintained with respect to existing policies. [570 F.2d at 394-395; citation omitted.[13]]

Applying the First Circuit's reasoning to the instant case, the extended insurance offered by petitioner, like the guaranteed insurability option in *Union Mutual,* provides *additional* life insurance coverage to persons who otherwise might not be able to obtain it, and is an additional benefit arising from the original life insurance policy. The fact that a contingency other than death itself triggers availability of the additional benefit (and petitioner's additional liability) should not disqualify the reserve.

The Court of Claims' decision in *Lincoln National Life Insurance Co. v. United States,* 217 Ct. Cl. 515, 582 F.2d 579 (1978), also is consistent with a plain reading of the statute. In that case, the taxpayer issued term life insurance policies with "conversion privilege" riders allowing policyholders to convert the term insurance to permanent life insurance without presenting evidence of insurability. Persons exercising the conversion privilege generally exhibited an "excess" mortality rate because the policyholder's tendency was to convert to permanent insurance at a time when the policyholder had become a "substandard risk." The Court of Claims held that the "preconversion reserve" maintained by the insurance company to provide for such expected excess mortality risk was a "life insurance reserve," describing it as a reserve established to fulfill an additional insurance benefit under the original *term* insurance policies. Thus, the taxpayer's reserve was set aside *to pay* life insurance claims.

Similarly, in *Mutual Benefit Life Insurance Co. v. Commissioner,* 58 T.C. 679 (1972), affd. 488 F.2d 1101 (3d Cir. 1974), a reserve was set up for provisions allowing a beneficiary to elect to receive death benefits in installments over the rest of the beneficiary's life, in lieu of the customary lump sum death benefit payment. Due to a lengthening of beneficiaries' life expectancies, election of the

---

[13]The First Circuit went on, however, to find that the reserve failed the computational requirements of sec. 801(b)(1)(A) and the "required by law" requirement of sec. 801(b)(2), two requirements conceded by respondent in the instant case. The First Circuit's holding in *Union Mutual Life Insurance Co. v. United States,* 570 F.2d 382 (1st Cir. 1978), with respect to sec. 801(b)(2) has been distinguished by this Court in *Equitable Life Insurance Co. v. Commissioner,* 73 T.C. 447 (1979) (discussed in connection with the second issue in the instant case).

installment option became increasingly costly to the insurance company, and the company established an additional reserve for the contingency that installment payments might be elected. The Government contended that such additional reserve was not a life insurance reserve, characterizing the election as the purchase of an annuity by the beneficiary with the lump sum proceeds of the policy. We disagreed with that characterization, stating that the optional settlement could not "be distinguished from the obligation of the petitioner to pay a death benefit under a life insurance contract." 58 T.C. at 689. In affirming our holding that the reserve qualified as a life insurance reserve, the Third Circuit stated that:

We * * * find that the insurer, in making payment under the specific settlement option involved in this controversy, does not enter into a new contract with the beneficiary but merely carries out the contractual obligation which arose with the initial issuance of the life insurance contract. [488 F.2d at 1107.]

Thus, in *Mutual Benefit,* the proper focus was on the basic nature of the claims as death benefits rather than on the contingency—i.e., election by the beneficiary—triggering the company's *additional* liability for death benefits. *Mutual Benefit* also stands for the proposition that "nonmortality" factors (in *Mutual Benefit,* factors concerning benefit election by the beneficiaries) may be taken into account in attempting to make a reserve calculation more exact. *USAA Life Insurance Co. v. Commissioner,* 94 T.C. 499, 528, 531 (1990); *Lincoln National Life Insurance Co. v. United States, supra* at 593; Ernst & Whinney, Federal Income Taxation of Life Insurance Companies 6-6 (2d ed. 1990). See also Rev. Rul. 69-444, 1969-2 C.B. 145, 146 (reserve maintained to provide for additional indemnity benefit where death results from a vehicular accident is a reserve for "insurance on life" "although [the benefit is] payable only as the result of a particular type of accidental death").

The most recent decision of this Court to interpret section 801(b)(1)(B) is *USAA Life Insurance Co. v. Commissioner, supra.* In that case, the taxpayer issued universal life insurance policies which allowed policyholders to receive the cash value of the policy if it were surrendered to the taxpayer, and partial cash value in the event of partial

surrenders. Under Texas law, insurance companies were required to maintain reserves equal to the aggregate cash surrender value of the policies if that aggregate amount was greater than the basic death benefit reserves; the taxpayer fell into that category of insurance companies and maintained reserves equal to the aggregate cash surrender value of the policies.

The issue in *USAA Life* arose in light of the taxpayer's attempt to revalue its reserves under the relief provisions of section 818(c). Because the desired relief was unavailable for section 801(b) "life insurance reserves" computed on a net level basis, the Government, rather than the taxpayer, argued that the aggregate cash surrender value set aside by the taxpayer was such a life insurance reserve. The taxpayer took the position that the amount in question could not qualify as a "life insurance reserve" under section 801(b)(1)(B) because the cash surrender value of its policies represented a present, *accrued* liability in the nature of a demand deposit, rather than future *unaccrued* claims "involving *life* contingencies." We agreed with the Government, stating that:

petitioner's cash surrender values may be considered future unaccrued claims within the meaning of section 801(b)(1)(B) because the policyholders had yet to surrender the policies and demand the cash values. There was a life contingency involved in any such claim because the future surrender and demand was dependent on the survival of the insured to that time. [94 T.C. at 536-537.[14]]

In further support of our conclusion that the reserve was a "life insurance reserve," we stated:

The cash surrender value for one of petitioner's universal life policies *could not be practically or meaningfully divorced from the life insurance contract or its associated insurance protection. A policyholder did not purchase the insurance component and the excess cash surrender value component separately.* In fact, the cash surrender value was not available to the policyholder, other than by means of a loan, unless the policyholder surrendered the policy and its insurance protection. [94 T.C. at 539; emphasis supplied.]

---

[14]In light of our conclusion that the cash value claims involved life contingencies, we found it unnecessary to adopt the Government's "broad construction" of sec. 801(b)(1)(B), requiring that only the contracts themselves, and not the relevant *claims,* involve "life contingencies." *USAA Life Insurance Co. v. Commissioner,* 94 T.C. 499, 535-536 (1990).

Applying our reasoning in *USAA Life* to the instant case, we believe that the extended insurance provisions cannot, in a practical or meaningful way, be divorced from the underlying group term life insurance contracts issued by petitioner. Like the taxpayer in *USAA Life*, petitioner never offered extended insurance for sale separately, and the ultimate benefit to be provided by extended insurance was the death benefit called for by the original contract. Because the benefit for which the disabled lives reserve was set aside (i.e., extended insurance) cannot be divorced from life insurance protection, the disabled lives reserve relates to *life insurance* claims under section 804(b)(1)(B).

### *Legislative History of Section 801(b)(1)(B)*

Second, respondent argues that the legislative history of section 801(b)(1)(B) conclusively establishes that the disabled lives reserve does not qualify. After reviewing such legislative history and the judicial setting in which it arose, we disagree.

The language of section 801(b)(1)(B)[15] was enacted as part of the Revenue Act of 1942 (the 1942 Act), ch. 619, sec. 163(a), 56 Stat. 798, 867.[16] Prior to that legislation, section 203(a)(2) of the Internal Revenue Code of 1939 provided companies which qualified as "life insurance companies" with a deduction for *all* "reserve funds required by law." Case law and regulations, however, restricted the allowable deduction to "technical" insurance reserves, that is, amounts (1) directly pertaining to insurance, as opposed to "solvency" reserves not peculiar to insurance companies, (2) computed on the basis of mortality or morbidity tables and assumed rates of interest and (3) related to unaccrued and contingent claims. *Helvering v. Inter-Mountain Life Insurance Co.*, 294 U.S. 686 (1935); *Maryland Casualty Co. v. United States*, 251 U.S. 342 (1920); *McCoach v. Insurance Co. of North America*, 244 U.S. 585 (1917); *Monarch Life Insurance Co. v. Commissioner*, 38 B.T.A. 716, 723-724 (1938), affd. 114 F.2d 314 (1st Cir. 1940); art. 203(a)(2)-1 of

---

[15]Formerly contained in sec. 201(c)(2), Internal Revenue Code of 1939.

[16]See *United States v. Consumer Life Insurance Co.*, 430 U.S. 725, 738, 744-745 (1977); *United Benefit Life Insurance Co. v. McCrory*, 414 F.2d 928, 930 (8th Cir. 1969).

Regulations 86 (1935). In our background discussion above, we discussed the last of such requirements.

Relying on the foregoing technical insurance reserve requirements, the Government attempted to deny preferential treatment to a variety of reserves, including "waiver of premium" reserves under life insurance policies (discussed above), basic health insurance reserves, and other miscellaneous reserves. See, e.g., *Monarch Life Insurance Co. v. Commissioner, supra.* The Government also advanced the argument that, in the case of a life insurance company, the phrase "reserve funds required by law" should include only reserves relating to *life* insurance. That second argument was described as "a novel proposition" lacking "any authority to support it," *Monarch Life Insurance Co. v. Commissioner,* 38 B.T.A. at 726, and eventually was rejected by the Supreme Court. *Helvering v. Oregon Mutual Life Insurance Co.,* 311 U.S. 267 (1940); cf. *New World Life Insurance Co. v. United States,* 88 Ct. Cl. 405, 26 F. Supp. 444 (1939), affd. on another issue 311 U.S. 620 (1940) (contrary view rejected by Supreme Court). Prior to the 1942 Act, the Internal Revenue Code simply drew no distinction between a life insurance company's reserves for life versus health insurance; rather, "Once a company [was] found to be a life insurance company  * * * , the type of its policies [was] no longer important; all its business [was] treated as though it were life insurance." *Commissioner v. Monarch Life Insurance Co.,* 114 F.2d at 323. See also *United States v. Occidental Life Insurance Co. of California,* 385 F.2d 1, 4-5 (9th Cir. 1967); *PanAmerican Life Insurance Co. v. Commissioner,* 38 B.T.A. 1430 (1938), affd. 111 F.2d 366 (5th Cir. 1940); *Equitable Life Assurance Society v. Commissioner,* 33 B.T.A. 708 (1935).

The 1942 Act distinguished the treatment of a life insurance company's reserves on cancelable versus noncancelable health insurance. H. Rept. 2333, 77th Cong., 1st Sess. (1942), 1942-2 C.B. 372, 453-454; S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 611-612. By altering the treatment of cancelable health insurance, Congress intended to equalize the treatment of life and casualty insurance companies with respect to such business. *United Benefit Life Insurance Co. v. McCrory,* 414 F.2d 928,

934-936 (8th Cir. 1969); *United States v. Occidental Life Insurance Co. of California, supra* at 7.[17] Respondent argues that, because the cases preceding the 1942 Act assumed that "waiver of premium" provisions for disabled individuals were a form of *health* insurance, Congress must have intended the cancelable/noncancelable distinction of the 1942 Act to apply in limiting the reserve deductions for such provisions.

We are not convinced that Congress intended to change the treatment of waiver of premium reserves as part of the 1942 Act. As indicated in Rev. Rul. 70-190, 1970-1 C.B. 150 (holding pre-1942 cases applicable in construing section 801(b)(1)(B)), the primary issue on which the pre-1942 cases focused in considering "waiver of premium" reserves was whether the claims to which such reserves related already had *accrued* by reason of the onset of disability. *Monarch Life Insurance Co. v. Commissioner,* 38 B.T.A. at 725; *Pan-American Life Insurance Co. v. Commissioner,* 38 B.T.A. at 1436-1439. The Government's second argument, i.e., that reserve deductions for life insurance companies should be limited to *"life"* reserves, was not aimed specifically at waiver of premium reserves. Rather, the cases in which that second argument arose involved policies which provided disability *income* benefits in addition to premium waiver benefits,[18] separate cancelable and noncancelable health and accident policies in addition to life insurance policies,[19] or health insurance policies alone.[20] In fact, in *Monarch Life, only* the "accrued versus unaccrued claim" issue was considered in deciding the treatment of waiver of premium reserves; the Board of Tax Appeals focused on the Government's argument against the deductibility of health

[17]The legislative history of sec. 801(b)(1)(B) reveals that life insurance was perceived as involving *long-term* risks to the life insurance company, and that noncancelable health insurance was viewed as analogous to life insurance for that reason. See *Economy Finance Corp. v. United States,* 501 F.2d 466, 480 (7th Cir. 1974). While such assumptions do not hold true in the case of 1-year *term* life insurance policies, where the premium rate may be adjusted to reflect the current risk, the provision has never been amended to distinguish between term and whole life insurance.

[18]*Helvering v. Oregon Mutual Life Insurance Co.,* 311 U.S. 267 (1940); *Pan-American Life Insurance Co. v. Commissioner,* 38 B.T.A. 1430 (1938), affd. 111 F.2d 366 (5th Cir. 1940) (involving policies providing premium waiver benefits and separate policies also providing disability income benefits).

[19]*Monarch Life Insurance Co. v. Commissioner,* 38 B.T.A. 716 (1938), affd. 114 F.2d 314 (1st Cir. 1940).

[20]*Equitable Life Assurance Society v. Commissioner,* 33 B.T.A. 708 (1935).

insurance reserves only in discussing the taxpayer's separate health insurance policies. See also Guadiana, "Federal Income Taxation of Life Insurance Companies: The Life Insurance Reserve," 30 Tax L. Rev. 173, 189 (1975) (taking the position that the 1942 Act did not change the treatment of disabled lives reserves). Thus, despite references in the cases to waiver of premium provisions as "disability" provisions,[21] we do not believe that the judicial setting in which the 1942 Act arose provides convincing evidence of congressional intent to treat such provisions as "health insurance" subject to the cancelable/noncancelable distinction. We believe that, had Congress intended to reverse the favorable treatment of waiver of premium reserves granted by the Supreme Court in 1940,[22] it would have been more explicit about doing so.[23]

The legislative history of section 801(b)(1)(B) itself contains no indication that Congress intended a *separate* test of premium waiver provisions for cancelability as health insurance. Rather, the legislative history of the provision expresses Congress' desire to conform to industry standards in describing health insurance contracts:

As the term is used in the industry, a noncancelable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the pro rata unearned premium must be carried to cover the renewal obligation. * * *

H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 372, 454; see also S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 612.[24]

---

[21]*Pan-American Life Insurance Co. v. Commissioner*, 38 B.T.A. at 1432; *Commissioner v. Oregon Mutual Life Insurance Co.*, 112 F.2d 468, 469 (9th Cir. 1940), affd. sub nom. *Helvering v. Oregon Mutual Life Insurance Co.*, 311 U.S. 267, 270-271 (1940).

[22]*Helvering v. Oregon Mutual Life Insurance Co., supra.*

[23]We note in that regard that, after the Supreme Court in *Helvering v. Oregon Mutual Life Insurance Co., supra,* invalidated the portion of a Treasury regulation excluding waiver of premium reserves from deductibility (art. 203(a)(2)-1 of Regulations 86 (1935)), such language was deleted by Treasury and was not reinstated in any form after the passage of the Revenue Act of 1942 (the 1942 Act), ch. 619, 56 Stat. 798.

[24]The legislative history's discussion of the pro rata unearned premium reserve and the "additional reserve" necessary for noncancelable health and accident insurance policies mirrors the descriptions of reserves on cancelable versus noncancelable health insurance found in *Equitable Life Assurance Society v. Commissioner, supra* at 710-711, and *Commissioner v. Monarch Life Insurance Co.,* 114 F.2d at 321-322, and discussed apart from the premium waiver issue.

Such definition does not appear to contemplate treating a waiver of premium provision on a life insurance policy as health insurance to be tested separately for "noncancellability."[25] Moreover, we have not seen any evidence that the insurance industry describes a waiver of premium provision as cancelable, or noncancelable, health insurance. Cf. *Pan-American Life Insurance Co. v. Commissioner, supra* at 1431 (describing waiver of premium provision a "noncancellable" benefit). We therefore reject respondent's argument that the legislative history of section 801(b)(1)(B) mandates denial of "life insurance reserve" status to the disabled lives reserve. We note that the only other court to have addressed the issue concluded that the legislative history of section 801(b)(1)(B) was "unhelpful" in resolving it. *Aetna Life Insurance Co. v. United States,* 16 Cl. Ct. 364, 376 (1989).

In conclusion, we hold that petitioner's disabled lives reserve qualifies as a life insurance reserve under section 801(b).[26]

## II. *Treatment of Deferred and Uncollected Premiums in the Context of Group Term Life Insurance*

### FINDINGS OF FACT

During the year in issue, petitioner sold and maintained various types of group term life insurance policies (collectively, group policies), including policies sold to individual employers (employer policies), policies sold to multiple employer trusts (trust policies), franchise mortgage protection life insurance marketed through banks to individuals (franchise policies), group mortgage protection life insurance

---

[25]*United Benefit Life Insurance v. McCrory,* 414 F.2d 928, 932-933 (8th Cir. 1969) (legislative history indicates that health insurance contract as a whole must be tested for cancelability at its inception).

[26]We note that petitioner submitted an expert report by an actuary, Daniel J. McCarthy (presumably the same individual whose affidavit was offered in *Aetna Life Insurance Co. v. United States,* 16 Cl. Ct. 364 (1989)), concluding that the reserve in question qualified as a life insurance reserve. While we relied on petitioner's expert report for certain information relating to computation of the reserve, we have not relied on the report's conclusion on the *legal* issue of qualification of the reserve under sec. 801(b). Although the legislative history of sec. 801(b) indicates Congressional intent to defer to industry usage in defining "noncancellable health insurance," petitioner's expert report did not provide significant information relating to industry classification of the extended insurance. Compare *Aetna Life Insurance Co. v. United States, supra* at 375-376 (finding identical issue to involve a question of law, not of such technical nature as to render expert testimony helpful).

marketed through banks to individuals (mortgage policies), and group credit insurance (credit policies). The term of each such policy depended on the relevant contractual provisions, with employer policies and trust policies providing insurance for successive 1-year terms, and franchise and mortgage policies providing a term of coverage which matches the term of the mortgage obligation. Premiums under petitioner's employer or trust policies were payable annually, semiannually, quarterly, or monthly at the option of the policyholder, while premiums under petitioner's franchise, credit, and mortgage policies were payable monthly.

The National Association of Insurance Commissioners (NAIC) is an organization of State insurance commissioners. The financial statement form prescribed by the NAIC is known in the life insurance industry as the "annual statement" (annual statement) and must be filed annually in each State in which a life insurance company does business. During the year at issue and at all relevant times, petitioner was regulated by the Insurance Commissioner of the State of Connecticut (the insurance commissioner) and filed annual statements with the insurance commissioner.

For annual statement purposes, "deferred premiums" on a life insurance policy are premium installments due between the yearend annual statement date and the next policy anniversary date, and "uncollected premiums" are premium installments that actually have been billed as of yearend but remain due and unpaid. In filing its annual statement with the insurance commissioner, petitioner utilized an "annual premium assumption" for its ordinary life policies as well as for the group policies. An annual premium assumption is an assumption that the *total* annual premium on a policy has been paid in advance on the policy anniversary date.[27] Historically, the assumption arose as a means of simplifying the computation of reserves (known as

[27]The reserve method associated with use of an annual premium assumption is also referred to as a "mean" reserve method. Such term arose historically due to the additional assumption, traditionally made, that each policy was issued halfway through the calendar year. Petitioner did not utilize that second assumption but instead calculated deferred and uncollected premiums using the *actual* policy anniversary date of each policy as the assumed date of payment of the annual premium. (Nevertheless, petitioner's reserve method may be referred to as a "mean" reserve method.)

policy "valuation") prior to the widespread availability of computers.

Under an annual premium assumption, as of the annual statement date (December 31) deferred and uncollected premiums are deemed to be *received.* Under actuarial theory, the result of such deemed receipt is an inclusion of the "net valuation portion" of deferred and uncollected premiums (i.e., the premium amount needed to meet policy obligations)[28] in life insurance reserves. To offset such additional reserve liability and avoid distortion in the annual statement, amounts attributable to the deferred and uncollected premiums also are included in assets and income in the annual statement.

The NAIC Accounting Practices and Procedures Manual (manual), which contains rules applicable in completing the annual statement, indicates that the use of an annual premium assumption is traditional. The manual also states that such assumption is used by "most companies" in computing reserves on "ordinary" life insurance policies (defined to include individual whole life, term, endowment, and franchise coverage). The manual indicates that an annual premium assumption *may* be used in the case of group term life insurance policies, noting that if such assumption *is* used for group term policies payable more frequently than annually, it would be "appropriate" to take deferred premiums into account in computing assets, income, and reserves. The annual statement form includes, in exhibit 13, a separate line for a "deferred and uncollected premium" asset attributable to group life insurance policies.

With respect to insurance companies filing in Connecticut, the annual premium assumption is used *infrequently* in the case of group term life insurance, although it is used typically in the case of ordinary whole life policies. Petitioner first reported deferred premiums on its group term life insurance contracts in its 1960 annual statement.

The manner in which an annual premium assumption (or mean reserve method) increases reserves for term life insurance policies may be illustrated by an example. The

---

[28]See *supra* note 6 for an explanation of the term "net valuation premium." In the instant case, the gross premiums charged by petitioner were less than the net valuation premium due to "negative loading."

"unearned premium reserve"[29] on a term life insurance policy reflects premiums that have been received by the insurance company as of the valuation date but are allocable to the period of coverage beyond the valuation date. The reserve is computed by allocating premiums *ratably* throughout the period to which they apply, i.e., up until the due date of the next premium installment. Thus, in the case of a 1-year policy with a monthly net valuation premium of $20 payable on the 15th day of the month, the "true" unearned premium reserve (i.e., the reserve absent an annual premium assumption) would be $10 as of the last day of the month, as half of the $20 has been "earned" over half of the month. The use of an annual premium assumption with respect to such policy causes a significant increase in the unearned premium reserve at the beginning of the policy term. Continuing the example, assuming a policy anniversary date of September 15,[30] and using the annual premium assumption (and actual anniversary date), the unearned premium reserve with respect to such a policy would be $240 (i.e., the annual net premium) on September 15 and approximately $170 as of the annual statement "valuation" date (December 31) due to a ratable decrease in the reserve of $20 per month over 3½ months. Thus, for annual statement purposes, the use of an annual premium assumption in the example would have increased the unearned premium reserve from $10 to $170. It should be noted that the unearned premium reserve for a 1-year term life insurance policy is *zero* at the *end* of the policy year (this is known as the "terminal reserve") because, as of that moment in time, there is no future coverage obligation and the entire net valuation premium has been "earned."

Connecticut adopted the NAIC's "Standard Valuation Law,"[31] under which life insurance companies are required to establish reserves in amounts that must not be less than certain minimum amounts. If a life insurance company establishes a reserve in excess of the statutory minimum,

---

[29]The concept behind an unearned premium reserve is that premiums paid in advance are "earned" ratably by the insurer over the policy period as the protection is provided. O.D. Dickerson, Health Insurance 604 (3d ed. 1968).

[30]A large percentage of petitioner's policies had policy anniversary dates falling between July and October.

[31]Conn. Gen. Stat. Ann. secs. 38-130, 38-130b to 38-130e (West 1978); Huebner and Black, Life Insurance 363 (10th Ed. 1982).

however, it cannot reduce that reserve without the approval of the insurance commissioner.[32] During the year in issue, Connecticut law did not specify whether an annual premium assumption must be used in calculating life insurance reserves. Petitioner's use of the annual premium assumption for its group term life insurance policies, however, produced reserves in excess of the statutory minimum (the "true" unearned premium reserve), and petitioner would have been required to obtain the approval of the insurance commissioner in order to reduce its reserves to a level based on actual premium receipts, i.e., the "true" unearned premium method. The insurance commissioner through his agents audits the life insurance reserves displayed in exhibit 8 of the annual statement. In performing his audit, the insurance commissioner applies standards promulgated by the NAIC and the Society of Actuaries which also may be incorporated in Connecticut law. Petitioner's annual statement for the year in issue was approved by the insurance commissioner.

## OPINION

The resolution of the treatment of deferred and uncollected premiums in the instant case involves the application of the Supreme Court's holding in *Commissioner v. Standard Life & Accident Insurance Co.*, 433 U.S. 148 (1977), to group term life insurance policies.[33] In *Standard*

---

[32]Conn. Gen. Stat. Ann. sec. 38-130e(g)(1) states:

(g)(1) In no event shall a company's aggregate reserves for all life insurance policies, excluding disability and accidental death benefits, issued on or after the effective date as specified in accordance with the provisions of subsection (h) of this section of the general statues, revision of 1958, revised to 1981, be less than the aggregate reserves calculated in accordance with the methods set forth in subsections (d), (e), (g), and (i) of this section, and the mortality table or tables and rate or rates of interest used in calculating nonforfeiture benefits for such policies; (2) reserves for any category of policies, contracts or benefits as established by the commissioner may be calculated, at the option of the company, according to any standards which produce greater aggregate reserves for such category than those calculated according to the minimum standard herein provided, but the rate or rates of interest used for policies and contracts other than annuity and pure endowment contracts, shall not be higher than the corresponding rate or rates of interest used in calculating any nonforfeiture benefits provided for therein; (3) *any such company which at any time shall have adopted any standard of valuation producing greater aggregate reserves than those calculated according to the minimum standard herein provided may, with the approval of the commissioner, adopt any lower standard of valuation, but not lower than the minimum herein provided.* [Emphasis supplied.]

[33]The parties stipulated that all of the policies for which reserve deductions are in issue are "group" policies, and our reference to group policies is meant to encompass all of such

*Life,* the Supreme Court found that the general rules of accrual method accounting "simply do not speak to the question of the scope to be given the entirely fictional assumption" that deferred and uncollected premiums have been received by a life insurance company. 433 U.S. at 162. Accordingly, the Court held that the flush language of section 818(a)[34] "requires use of the NAIC approach to fill the gap" in accrual method accounting, resulting in the inclusion of the net valuation portion of deferred and uncollected premiums in life insurance reserves, assets, and gross premium income. 433 U.S. at 162.[35] It should be noted that the inclusion of deferred and uncollected premiums (referred to collectively by the Supreme Court as "unpaid premiums") in income is not contemplated under the normal rules of accrual method accounting because a life insurance company ordinarily does not have a legally enforceable *right* to collect such premiums. *Commissioner v. Standard Life & Accident Insurance Co., supra* at 150. A thorough discussion of *Standard Life* is set forth in *Anchor National Life Insurance Co. v. Commissioner,* 93 T.C. 382, 414-421 (1989), which we will not repeat in this opinion. See also *Time Insurance Co. v. Commissioner,* 86 T.C. 298, 325-327 (1986).

In the instant case, petitioner included amounts attributable to deferred and uncollected premiums on its group term life insurance policies in life insurance reserves, assets, and premium income. Notwithstanding the partially offsetting results of those entries, the net effect of such inclusion

---

policies, despite petitioner's request that we find the franchise policies to be "individual" policies.

[34]Sec. 818(a) provides:

SEC. 818(a). METHOD OF ACCOUNTING.—All computations entering into the determination of the taxes imposed by this part shall be made—
  (1) under an accrual method of accounting, or
  (2) to the extent permitted under regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).
Except as provided in the preceding sentence, *all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.*
  [Emphasis supplied.]

[35]The Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, reversed the Supreme Court's holding in *Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148 (1977). See Staff of the J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act, at 599, 620-622 (J. Comm. Print 1984); *Anchor National Life Insurance Co. v. Commissioner,* 93 T.C. 382, 420 n.27 (1989).

was to decrease petitioner's taxable income for the year in issue. Respondent's notice of deficiency states that petitioner's reserves held with respect to deferred and uncollected premiums do not qualify as life insurance reserves. The notice of deficiency also makes a correlative adjustment to assets.

While acknowledging that the Supreme Court expressly did not limit its holding in *Standard Life* to ordinary life insurance policies, respondent argues that such a limitation is warranted by the Supreme Court's finding that State law and the NAIC *required* the use of an annual premium assumption in computing the taxpayer's reserves, a statement which respondent claims does not hold true in the context of group term life insurance. Respondent points to the testimony of Earle McCan, a Connecticut insurance examiner responsible for reviewing life insurance reserves,[36] that, in the case of group term life insurance, the annual premium assumption was neither "required" (in the ordinary sense of the word) by Connecticut law nor commonly *used* by insurance companies. Respondent further argues that the reserve in question is not "required by law" within the meaning of section 801(b)(2).

We are unwilling to adopt respondent's distinction of *Standard Life* based on the State law and NAIC "requirements" applicable to ordinary versus group term life insurance policies for several reasons. First, the Supreme Court's finding that State law *"requires"* insurance companies to use an annual premium assumption was based on a stipulation of the parties in that case which appears questionable or incomplete. Indeed, General Counsel Memorandum 38404 (June 6, 1980) underlying Revenue Ruling 81-243, 1981-2 C.B. 149, states that:

*We have been unable to document the statement of the Supreme Court in the Standard Life & Accident case that state law requires the inclusion of deferred and uncollected premiums in life insurance reserves.* In fact, our analysis of the history of the treatment of deferred and collected [sic] premiums indicates that the annual statements required to be filed under state law as evidence of companies' financial condition merely provided

---

[36]Mr. McCan worked in the valuation (i.e., reserve computation) section of the insurance commissioner's examination division for 27 years and became chief of the examination division in 1971. The responsibility of the valuation section in which Mr. McCan worked was to audit the life insurance reserves contained in exhibit 8 of the annual statement.

for the valuation of all policies on an annual basis in accordance with generally accepted practice. This procedure resulted in what the courts characterized as a state law requirement that a reserve be maintained for all those policies valued annually which would include deferred and uncollected premiums. See T. Nash, Federal Taxation of Life Insurance Companies 6-4 (Vol. 1, 1979). [Emphasis supplied.]

Respondent, on brief, similarly indicates that there is no suggestion in the *Standard Life* opinion that the Supreme Court "in fact performed [a] laborious analysis [of State law], rather than relying on the stipulated record," and notes that the Commissioner generally has not *disputed* the requirement of an annual premium assumption. See also *Southwestern Life Insurance Co. v. United States,* 9 Cl. Ct. 102, 111-112 (1985) (referring to the "apparently unfounded and therefore gratuitous concessions made at argument on behalf of the Commissioner" in *Standard Life*).[37]

The testimony of Mr. McCan and the language of the manual weaken any distinction between ordinary and group term life insurance based on State law and NAIC "requirements"; Mr. McCan testified that he did not think that an annual premium assumption was "required" under Connecticut law even in the case of *individual* (i.e., ordinary) life insurance,[38] and the manual merely states that, in computing reserves on ordinary insurance, "most" companies use an annual premium assumption.[39] In summary, based on the record and on our own review of Connecticut law, we are left to conclude that, in the case of both ordinary and group term life insurance, the use of an annual assumption is elective, although more common in the case of ordinary life insurance. We therefore reject respondent's attempt to distinguish *Standard Life* based on the different State and NAIC "requirements" for ordinary versus group term insurance.

---

[37]In *Anchor National Life Insurance Co. v. Commissioner, supra* at 395, we found that the annual statement form prescribed by the NAIC and adopted by the California Insurance Department "required" the inclusion of deferred and uncollected premiums in premium income and assets. However, unlike the instant case, that case did not turn on the question of whether State law and the NAIC "required" the use of an annual premium assumption.

[38]We relied on similar testimony by an employee of a State insurance department as to State law reserving requirements in *Time Insurance Co. v. Commissioner,* 86 T.C. 298, 322-324 (1986).

[39]A Society of Actuaries study (study) detailing NAIC accounting practices for group term life insurance policies indicates that the annual statement form, or "blank," assumes that reserves on such policies are computed in the same manner as reserves for ordinary 1-year term insurance (i.e., using an annual premium assumption).

Respondent further argues that the *Standard Life* holding is limited to ordinary life insurance policies based upon the Supreme Court's statement that "for the past *century*, insurance companies have added an amount equal to the net valuation portion of unpaid premiums in their reserves with an offsetting addition to assets." *Commissioner v. Standard Life & Accident Insurance Co.*, 433 U.S 148, 150 (1977) (emphasis supplied). Respondent, subtracting 100 years from the year of the Supreme Court's opinion and thereby arriving at 1877, concludes that the Court could *not* have been referring to group term life insurance, because the first group term life insurance policy was not issued until 1911. We find that such argument (which is relied upon in Rev. Rul. 81-243, *supra*) represents an overexercise of literalism. In short, the weakness of respondent's argument serves to underscore the fact that there is no express indication in *Standard Life* that the holding is limited to ordinary life insurance.

Because the Supreme Court's findings as to State and NAIC "requirements" in *Standard Life* were based on stipulated facts absent in the instant case, we are left to decide whether petitioner's computation method for deferred and uncollected premiums on group term life insurance was "consistent with the manner required for purposes of the annual statement" under the flush language of section 818(a) and whether the relevant reserve was "required by law" under section 801(b)(2). We believe that those two questions must be answered consistently and that our precedent under section 801(b)(2) provides an affirmative answer.

In *Mutual Benefit Life Insurance Co. v. Commissioner*, 58 T.C. 679 (1972), affd. 488 F.2d 1101 (3d. Cir. 1974),[40] a New Jersey statute specifically permitted the taxpayer to set up additional reserves for provisions in its policies allowing beneficiaries to elect to receive death benefits in lifetime installments. The Government argued that such additional reserves, prompted by reason of increases in life expectancies, were not "required by law" within the meaning of section 801(b)(2) because they were discretionary or permis-

---

[40]Discussed *supra* pp. 511-512.

sive under the New Jersey statute. We rejected such argument, stating that:

> On its face, the phrase "required by law" would appear to exclude a reserve which in the first instance was permissive rather than mandatory. In the taxation of the life insurance industry, however, we must look beyond the ordinary meaning of the words in the statute. *Alinco Life Insurance Co. v. United States,* 373 F.2d 336, 352-353 (Ct. Cl. 1967). [58 T.C. at 689.]

We then quoted section 1.801-5(b), Income Tax Regs., defining "required by law" to include not only State statutes but also rules and regulations of State insurance departments, and noted that under the New Jersey statute, approval by the New Jersey insurance commissioner would be required to reduce the additional reserve once established. We thus held the additional reserve to be "required by law," stating that:

> It cannot seriously be argued that the additional reserve voluntarily set up by the petitioner prior to the years before the Court was not required to be maintained by virtue of the regulatory powers specifically granted to the State commissioner of banking and insurance. In the taxable years under consideration, therefore, there was on the books of the petitioner a reserve established in prior years pursuant to State law which had achieved the status of a reserve required to be maintained under the regulatory authority of the State agency. * * * [58 T.C. at 690.]

The Third Circuit agreed, explaining that:

> Thus, while the initial decision to set up a reserve was entirely voluntary, *its continuance was not.* What the Company did in 1946 was of its own choosing, but in 1958 to 1960 it was not free to drop the reserve or to alter its formulation without having specific permission from the Insurance Commissioner. To argue that the Company was not required to carry the reserve in the years in question is to ignore reality. * * * A man may enter into a marriage voluntarily, but that is not a reason to limit his obligation imposed by the law to support his family. * * * [488 F.2d at 1106; fn. ref. omitted; emphasis supplied.]

In *Equitable Life Insurance Co. of Iowa v. Commissioner,* 73 T.C. 447 (1979), we followed *Mutual Benefit* in addressing the meaning of the term "required by law." *Equitable Life* also involved policies allowing beneficiaries to receive death benefits in the form of life annuities, and the taxpayer sought and received the approval of the Iowa Insurance Commissioner to establish additional reserves to

reflect inaccuracies in the mortality table and interest rate assumptions upon which its basic death benefit reserves were calculated. Although the Iowa statute contained no specific provision relating to such additional reserves, the Iowa statute provided that:

> Any * * * company which at any time shall have adopted any standard of valuation producing greater aggregate reserves than those calculated according to the minimum standard herein provided may, *with the approval of the commissioner*, adopt any lower standard of valuation, but not lower than the minimum herein provided. [73 T.C. at 459 n.11; emphasis supplied.]

Characterizing our holding in *Mutual Benefit Life* as being based on "the fact that any change in the reserves required the approval of the State regulatory agency," 73 T.C. at 462, we held the reserve in *Equitable Life* to be "required by law" in view of the need for such approval under Iowa law.

In the instant case, the relevant Connecticut statute[41] contains language identical to the provision involved in *Equitable Life* (both Iowa and Connecticut having adopted the NAIC's "Standard Valuation Law"). Mr. McCan also confirmed that, in practice, a company wishing to change from the reserve method used by petitioner for group term life insurance policies to a "true" unearned premium method would be required to obtain the approval of the insurance commissioner for such change. Accordingly, under our holdings in *Mutual Benefit* and *Equitable Life*, petitioner's reserve attributable to deferred and uncollected premiums was "required by law."

We recognize that the Claims Court has reached a contrary conclusion in a case also involving reserves with respect to deferred and uncollected premiums. *Southwestern Life Insurance Co. v. United States*, 9 Cl. Ct. 102 (1985). Like this Court, however, the Claims Court called into question the validity of the Supreme Court's assumption in *Standard Life* that State law "requires" the use of an annual premium assumption, apparently referring to such assumption as an "unfounded" concession made on behalf of the Commissioner. The Claims Court's analysis departs from our own in that it turns on the different meanings, in

---

[41]Quoted *supra* note 32.

English usage, of the words "required" and "permit," holding that a deferred premium reserve *permitted* by law is not a reserve "required by law." Because the Claims Court's analysis only focuses on the initial decision to set up a reserve and does not consider whether an *initially* permissive reserve may become "required" by reason of the need to obtain approval for its reduction, we find our analysis more persuasive.

Respondent, moreover, urges us to adopt the approach of the First Circuit in *Union Mutual Life Insurance Co. v. United States,* 570 F.2d 382 (1st Cir. 1978). In that case, the First Circuit held that a reserve for a policy option permitting an insured to obtain additional insurance without a physical examination was not "required by law" where State law lacked any statutory provision expressly authorizing the additional reserve or any rule or regulation of the State insurance commissioner dealing with such additional reserve. In *Equitable Life Insurance Co. of Iowa v. Commissioner, supra* at 461, however, we distinguished *Union Mutual* from a situation, such as that involved in the instant case, in which "the statute required reserves at the minimum rate for life insurance and annuity contracts and permitted such reserves at a higher rate," but also required permission to lower a reserve once a higher rate was established. Because the Connecticut statute applicable in the instant case is identical in relevant part to the statute relied upon in *Equitable Life,* we adhere to our holding in *Equitable Life* in interpreting section 801(b)(2).

In conclusion, we hold that petitioner's reserve with respect to deferred and uncollected premiums on group term life insurance policies was "required by law" under section 801(b)(2).

We believe that the foregoing analysis also applies in deciding whether the annual premium assumption was, under the flush language of section 818(a), consistent with the manner of computation *"required* for purposes of the annual statement approved by the [NAIC]."[42] The regulation defining "reserves required by law" under section 801(b)(2)

---

[42]As noted in *Anchor National Life Insurance Co. v. Commissioner,* 93 T.C. 382, 393 n.5 (1989), the purpose of the NAIC is to prescribe model regulations and laws and recommend their adoption by State to promote uniform insurance regulation throughout the nation.

states that reserves required by law also are required for purposes of the annual statement referred to in section 818(a):

(b) *Reserves required by law defined.* For purposes of part I, subchapter L, chapter 1 of the Code, the term "reserves required by law" means reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, *and which are reported in the annual statement of the company and accepted by state regulatory authorities* as held for the fulfillment of the claims of policyholders or beneficiaries. [Sec. 1.801-5(b), Income Tax Regs.; emphasis supplied.]

Moreover, *State regulatory authorities* review a life insurance company's annual statement. Thus, even though the use of a particular computation method results in reserves in excess of the statutory minimum, if such reserves are "required" by State law during the year in issue by virtue of the need to obtain State approval for a change, the computation method in question also is consistent with the manner of computation "required" to be used by the company in completing its annual statement for such year. Accordingly, we hold that petitioner properly used an annual premium assumption for its group term life insurance policies pursuant to the flush language of section 818(a).

Respondent makes one further argument for excluding petitioner's reserve attributable to deferred and uncollected premiums from "life insurance reserves." Specifically, respondent argues that the reserve was not an amount "set aside" as required by section 801(b)(1)(B). Respondent points to the inherently fictional nature of such reserve, which was based on the fact that the annual premium assumption was used. Respondent also points to the fact that the increase in reserve is offset by a deferred premium "asset" under *Standard Life.* In support of his argument, respondent cites section 1.801-4(a), Income Tax Regs., which states that life insurance reserves "must actually be held by the company during the taxable year for which the reserve is claimed."[43] We reject respondent's argument for disquali-

---

[43]Respondent's notice of deficiency refers to the reserve "held" by petitioner with respect to deferred and uncollected premiums. Petitioner, however, responds to respondent's "set aside"

fying the reserve based on several considerations. As one commentator has noted in connection with the "set aside" requirement:

A [life insurance] reserve is not and never has been a "fund" in the legal sense. The current regulations could also lead to some misunderstanding when they state that "such amounts must actually be held by the company during the taxable year." Reserves are not amounts set apart from the general assets of the company. Instead, the company, by establishing reserves on its books, represents that it will have sufficient assets to back up those reserves and thereby provide the necessary solvency needed to meet policyholder claims. Any argument that a reserve is a fund separate and apart from the general assets of an insurance company is quickly rebutted when one remembers that from 1909 to the current date Congress has attempted to allow deductions or exclusions predicated only on reserves which are "required by [State] law," that is, reserves which represent liabilities on a company's *annual statement.* [Guadiana, "Federal Income Taxation of Life Insurance Companies: The Life Insurance Reserve," 30 Tax L. Rev. 173, 181-182 (1975); fn. refs. omitted; emphasis supplied.]

An insurance treatise similarly states that:

To qualify as a life insurance reserve, amounts must be "set aside." This does not mean that specific amounts of assets must be earmarked for a particular purpose. The regulations say that reserves must actually be held by the life insurance company to qualify as life insurance reserves. This requirement is generally satisfied by reflecting the reserve in the annual statement. [K. Tucker & D. Van Mieghem, Federal Taxation of Insurance Companies, par. 2.24 (1986); fn. refs. omitted.]

Recently, we also have characterized life insurance reserves as "bookkeeping entries reflecting liabilities · on the insurance company's books and * * * not * * * funds actually set aside in something like a trust fund. * * * It is the company's surplus that actually protects the policyholders." *Anchor National Life Insurance Co. v. Commissioner,* 93 T.C. 382, 419 n.25 (1989). See also *Mutual Benefit Life Insurance Co. v. Commissioner,* 488 F.2d 1101, 1103 (3d Cir. 1974). Thus, despite the use of the words "set aside" in section 801(b)(1)(B), it is quite clear that the general concept of life insurance reserve does not require an actual receipt of funds by the company and placement of those funds in an account.

---

argument on the merits in its reply brief and apparently does not claim that such issue was raised too late by respondent.

Moreover, we believe that the Supreme Court's analysis in *Standard Life* mandates that the fictional assumption of advance receipt of annual premiums be accepted in defining reserves under the provisions of the Life Insurance Company Income Tax Act of 1959, applicable in the instant case. The Supreme Court, in discussing the passage of the 1959 legislation, stated that:

In view of the critical importance of the definition of reserves in the entire statutory scheme, as well as in the conduct of the company's business, *the practice of including net unpaid [i.e., deferred and uncollected] premiums in reserves cannot have been unknown to Congress. It is clear, we think, that no radical departure from past law was intended.* [433 U.S. at 157-158; fn. ref. omitted; emphasis supplied.]

The Supreme Court then expressly *adopted* the fictional assumption that, in accordance with NAIC accounting methods the net valuation portion of the premium has been paid. See *Anchor National Life Insurance Co. v. Commissioner, supra* at 414-421. We have reached the same conclusion under sections 801(b)(2) and 818(a) even absent the stipulated facts concerning State and NAIC "requirements" which were present in *Standard Life.*

Section 818(a) provides a method of making "all computations entering into the determination of the taxes imposed by [sections 801 through 820]." Thus, the provision expressly applies for purposes of computing the "life insurance reserves" described in section 801. We believe that the Supreme Court's acceptance of the fictional assumption that unpaid premiums have been received for purposes of section 818(a) also requires acceptance of the premise that reserves for such premiums may be "set aside" for purposes of section 801(b)(1)(B).[44] Finally, because the annual statement method applicable under section 818(a) does not "net" the deferred premium asset against the reserve for deferred and uncollected premiums,[45] we reject respondent's attempt to

---

[44]See *Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148, 152 n.7 (1977) (quoting *Prudential Insurance Co. of America v. Herold,* 247 F. 681 (D.N.J. 1918)).

[45]See T. Nash, Federal Taxation of Life Insurance Companies 8-22 (1983) in which it is stated:

In accounting for the [deferred and uncollected premium] reserves, there were basically two methods which could have been used to correct this overstatement. The first method would have been to show the deferred premium as an offset to the reserve, thus reducing the total reserve to a figure which would have reflected a paid-for basis. *Instead of following this procedure,* the [annual] statement forms set up an asset account to balance the overstatement. [Emphasis supplied.]

impose such a "netting" by means of the "set aside" requirement of section 801(b)(1)(B).

Based on the foregoing, we hold that petitioner properly included net deferred and uncollected premiums in life insurance reserves, assets, and premium income.[46]

## III. *Agents' Commissions as Investment Expenses*

### FINDINGS OF FACT

During the year in issue, petitioner sold life insurance policies through life insurance agents. The relationship between petitioner and its agents was governed by the terms of "Standard Commission Contracts" (contracts) entered into between petitioner and the agents. Under the contracts, petitioner gave the agent the right, among other things, to solicit applications for insurance and to "service" the resulting policies subject to the contract terms and company regulations.

The contracts themselves did not specify any servicing activities required of an agent. Nevertheless, petitioner's "Rate Manual," which was supplied to every agent during the year in issue as a guide and reference source to agents' activities, indicated that the agents had immediate responsibility for the quality of certain policyholder services because the agents had direct contact with policyholders. The section of the Rate Manual entitled "Agent's Digest of Policyholder Service" informed agents of the appropriate form and signature requirements for numerous service transactions, including assignments, beneficiary changes, policy changes, and policy loans (including premium loans, cash loans, and automatic premium loans).

---

[46]We note that one of the expert reports submitted by respondent with respect to the deferred and uncollected premium issue concluded that, if it were determined that a reserve with respect to deferred and uncollected premiums *was* required for petitioner's group term life insurance policies, then a portion of such reserve should be treated as "deficiency reserve," in view of the "negative loading" (excess of net valuation premiums over gross premiums) characteristic of the policies. Respondent did not raise the "deficiency reserve" issue as an alternative argument in his trial memorandum or opening brief. The only "argument" by respondent regarding this issue is an objection to one of petitioner's proposed findings of fact. In that regard, respondent's reply brief states that, as noted by his expert, a portion of the deferred and uncollected premium reserve "could be viewed as a deficiency reserve that should be reported as such on petitioner's annual statement." We do not deem such statement adequate to raise the issue of whether some portion of the reserve is a "deficiency reserve" excluded from "life insurance reserves" under sec. 801(b)(4). As neither party has argued the substance of such issue, we have not considered it.

Petitioner's "Branch Office Manual," which contained rules and regulations for the operation of petitioner's branch offices, also referred to the services provided by agents to policyholders and contained specific rules for the provision of continued service to "orphan" policyholders, that is, those policyholders for whom the original selling agent was unable to deliver adequate service (sometimes because of termination of the agency with petitioner). The Branch Office Manual also contained information about petitioner's "Policyholder Service Reports," which were documents prepared by petitioner's centralized service center, distributed to petitioner's branch offices, and finally sent to petitioner's agents for delivery to policyholders. Policyholder service reports contained detailed information about the status of the policy, including facts about policy loans.

During the year in issue, 85 percent of the ordinary life insurance policies issued by petitioner were whole life and endowment contracts which had "cash values." The policies with cash values generally contained provisions permitting policyholders to borrow against such values; under those provisions, petitioner was obligated to make policy loans, within certain limits, without regard to the desirability or profitability of such loans relative to other investments available to petitioner. The interest rates charged by petitioner on policy loans generally were lower than current market rates at the time the loans were extended. During the year in issue, Connecticut law provided for a maximum fixed interest rate of 8 percent on policy loans, and the interest rates on petitioner's policy loans varied between approximately 6 and 8 percent.

Some of the cash value life insurance policies issued by petitioner during the year in issue and in prior years were marketed on a "minimum deposit" basis to high income individuals and corporations (such policies are hereinafter referred to as minimum deposit policies). Minimum deposit was a method of reducing the after-tax cost of insurance by financing premium payments with regular policy loans. However, for the interest payments on such loans to be deductible for Federal income tax purposes under section 264(c), four out of the first seven annual premiums had to be paid other than through borrowing against cash value.

Petitioner was an industry leader in the minimum deposit market, having designed four types of minimum deposit policies. Between 75 and 80 percent of the cash values of petitioner's minimum deposit policies were utilized as policy loans. As of December 31, 1980, the dollar amount of petitioner's outstanding policy loans was $664,145,903.

The sales efforts required to sell minimum deposit policies were more extensive than the efforts required for the sale of other life insurance policies. Multiple written borrowing proposals were prepared by branch office personnel based on information supplied by the agents. The agents then were responsible for explaining the mechanics and tax consequences of each option to the prospective policyholder and the policyholder's tax adviser. Each year, moreover, the policyholder of a minimum deposit policy would receive a computer-generated notice stating that the gross annual premium was due; such notice would not contain any information about the option of borrowing to pay such premium. It therefore was an agent's responsibility to contact the minimum deposit policyholder and explain, either in person or by letter, the options available to the policyholder with respect to "payment" of the premium billed.

Not all of petitioner's agents had significant involvement in the sale of minimum deposit policies; minimum deposit policies generally were written by more experienced agents. Policies other than minimum deposit policies had loan features, but such loan features were not always utilized by the policyholders; in some instances the cash value of such policies did not support significant policy loans until the passage of many years. Petitioner attempted to discourage systematic borrowing from ordinary life insurance policies that were not designed specifically for minimum deposit. As of the end of the year 1981, with respect to in-force life insurance and endowment policies issued by petitioner prior to 1981, 64 percent of the total cash value of such policies was borrowed.

Petitioner's agents' compensation was based on commissions equal to various percentages of first year and renewal premiums on policies sold. The duration of renewal commissions depended upon several factors, including the agent's

annual production of new paid premiums and the agent's length of service with petitioner. Because the receipt of renewal commissions always depended upon petitioner's continued receipt of premium payments, agents had an incentive to provide policyholders with adequate service to prevent policyholders from moving their business to a competitor.

Under the agents' contracts, petitioner paid "vested" renewal commissions to the agent who had sold the policy even if the selling agent was no longer under contract with petitioner. If the selling agent was unable to continue to provide service to a policyholder, the "orphaned" policyholder generally would be assigned another agent. In the case of "orphaned" minimum deposit policyholders, agents assigned to service those policyholders had an incentive to provide quality service (despite the absence of any renewal commission) because the policyholders generally were affluent individuals who might make other insurance purchases.

Under the agents' contracts, in addition to the first year and renewal commissions, agents were entitled to "persistency bonuses," which bonuses were not vested but were dependent on the continuation of a contractual relationship between the agent and petitioner. Agents who satisfied minimum production levels also received reimbursement from petitioner of a portion of their administrative expenses as well as benefit packages consisting of health insurance, short-term disability insurance, and group life insurance. Petitioner's branch offices did not provide general secretarial assistance to the agents.

In 1977, petitioner surveyed (the 1977 survey) its top-producing agents. An "Agency Vice President Newsletter" described the 1977 survey as follows:

> In a few days, a number of selected agents will be asked to participate in a study of the time agents spend in activities directly related to policy loans. The reason for the study is that in the corporate tax returns policy loans are considered an expense and such expenses are tax deductible. As you know, these are the only expenses for which we are allowed a tax deduction. All other field expenses are paid by the company without benefit of tax relief.
>
> Since the study occurs at a time when we are actively seeking more full premium business, there is the possibility that some agents may interpret the study as somehow being connected with their minimum deposit sales.

Consequently, they may be suspicious or reluctant participants. * * * Please encourage your agents to participate fully since the results of the study will enable us to document considerable tax savings.

A cover memorandum sent to "Office Managers and Office Supervisors" in connection with the 1977 survey explained the tax-oriented purpose of the 1977 survey and directed office managers and supervisors to explain such purpose to the agents and assist them in completing the survey. The high-producing agents to whom the 1977 survey was distributed comprised the category of agents most likely to sell minimum deposit policies.

During the year in issue, petitioner paid or incurred $32,689,623 in agents' commissions on its ordinary (i.e., individual) life insurance business, including whole life, annuity, endowment, and term policies. Fifteen percent of the ordinary life insurance policies issued by petitioner during the year in issue were term policies which did not have cash values and with respect to which petitioner did not extend any policy loans. Petitioner, however, did not maintain statistics identifying the amount of agents' commissions attributable to sales of such term policies.

On its Federal income tax return for the year in issue, petitioner treated approximately 34 percent of the agents' commissions, or $11,147,161, as investment expenses. That percentage was calculated by dividing petitioner's gross investment income attributable to ordinary life insurance products ($141,794,036) by its total gross income (investment income plus premium income, or $415,774,862) attributable to such products. The amount of interest income from policy loans received by petitioner during the year in issue (and included in gross investment income of $141,794,036 on petitioner's return) was $33,231,123.

OPINION

Respondent's determination disallowed the deduction of the $11,147,161 in agents' commissions as investment expenses under section 804(c)(1). Respondent contends that agents' commissions are expenses of producing underwriting (i.e., premium) income and as such are deductible, if at all, only under section 809(d)(11) (in computing "gain and loss from operations"). A description of the "three phrase"

system of the Life Insurance Company Income Tax Act of 1959,[47] the intricacies of which may render a deduction under section 804(c)(1) much more valuable than a deduction under section 809, is contained in *Union Central Life Insurance Co. v. Commissioner,* 77 T.C. 845, 849-854 (1981), revd. on other grounds 720 F.2d 420 (6th Cir. 1983), on remand 84 T.C. 361 (1985), and will not be repeated here. See also *USAA Life Insurance Co. v. Commissioner,* 94 T.C. 499, 516-517 (1990); *Liberty National Life Insurance Co. v. United States,* 816 F.2d 1520, 1522 n.3 (11th Cir. 1987) (explaining "why a company would desire to allocate an expense to investment expenses rather than to underwriting expenses"); Harman, "The Pattern of Life Insurance Company Taxation Under the 1959 Act," 15th Ann. Tul. Tax. Inst. 686 (1965).

Petitioner contends that commissions paid to its agents qualify under section 804(c)(1) as "general expenses" a portion of which may be "assigned to or included in investment expenses." "General expenses" are defined in the applicable regulations as "any expense paid or incurred for the benefit of more than one department of the company rather than for the benefit of a particular department thereof." Sec. 1.804-4(b)(1)(ii), Income Tax Regs. In that regard, the "investment department" of a life insurance company is to be distinguished from its "life insurance business," or underwriting department. See sec. 1.804-4(b)(4), Income Tax Regs.; *Union Central Life Insurance Co. v. Commissioner, supra.*[48] "Investment expenses" are defined in the regulations as "those expenses of the taxable year which are fairly chargeable against gross investment income." Sec. 1.804-4(b)(1)(i), Income Tax Regs.

Respondent's argument that the agents' commissions were incurred *exclusively* for the benefit of petitioner's underwriting department was addressed by the Fourth Circuit in *Liberty Life Insurance Co. v. United States,* 594 F.2d 21 (4th Cir. 1979). In that case, the taxpayer treated commissions as investment expenses based on its agents'

---

[47]Pub. L. 86-69, 73 Stat. 112, effective for taxable years beginning after Dec. 31, 1957.

[48]The distinction is of historical significance; from 1921 through 1957, life insurance companies were taxed on net investment income but not income from their insurance business. See Harman, "The Pattern of Life Insurance Company Taxation Under the 1959 Act," 15th Ann. Tul. Tax. Inst. 686, 715 (1965).

policy loan services. The Government disputed such treatment, pointing to the fact that the agents' commissions were based *solely* on premium income and not on the provision of services to policyholders. The Fourth Circuit, however, disagreed, stating that:

The issue is simple and clearcut: Does the loan servicing work of the field representatives generate investment income? If so, an allocable portion of the commissions paid as compensation for those activities is a legitimate investment expense. * * * [594 F.2d at 25.]

Thus, according to the Fourth Circuit's reasoning, where an activity generates investment income, some amount of the expense associated with the activity should be deductible against such income. The statute is silent on the issue, and section 1.804-4(b)(1), Income Tax Regs., requires no more. See also T. Nash, Federal Taxation of Life Insurance Companies 31-52 (1983).

In the instant case, the evidence clearly shows that the activities of petitioner's agents "generated" investment income in the form of policy loan interest. Respondent, however, maintains that it is inappropriate to use policy loan activities as a basis for treating commissions as an investment expense because (a) commissions do not increase proportionately with increased policy loans, (b) commissions are taken into account in pricing *premiums,* and (c) agents' activities with respect to policy loans are aimed at *selling* policies and maintaining those that are in force, rather than at generating interest income for the insurance company. In *Liberty Life,* the Fourth Circuit considered and rejected similar arguments, stating:

(1) the use of premiums alone for calculating the agents' commissions is not dispositive, since those commissions are intended as full compensation for all of the agents' duties, including the loan work. (2) The profitability of the policy loans as investments is also of little significance in this inquiry; profitable or not, the loans were legitimate interest-bearing investments with expenses connected to them. (3) The inclusion in the premium calculation of the costs of loan services actually supports the plaintiff's position, since the compensation for the field representatives' services is calculated directly from those premiums. (4) Plaintiff's motive in making the policy loans is irrelevant to the question of whether or not they were investments. *Plaintiff no doubt offered these loans to make its underwriting business more attractive to prospective clients. Nevertheless, the loans generated investment income, and we find no*

*requirement of "investment intent" in the statute, regulations, or legislative history.* \* \* \* [594 F.2d at 25; emphasis supplied.[49]]

Respondent distinguishes *Liberty Life* on the ground that the District Court had found that the agents performed loanoriented services that "ordinarily" would be handled by an insurance company's home office personnel.[50] Respondent argues that, in the instant case, petitioner's home and branch office personnel *did* perform policy loan services for which a deduction has already been claimed, and that allocating agents' commissions based on policy loan services would duplicate that deduction. We do not agree. While the agents in *Liberty Life* may have routinely performed some services that generally were not performed by petitioner's agents (for example, delivering loan checks and collecting loan payments), the duties for which a deduction was allowed in that case included "explaining the terms of the loans,"[51] a duty which clearly fell upon petitioner's agents, rather than upon other personnel employed by petitioner.

Respondent distinguishes *Liberty Life* on the additional ground that the Fourth Circuit found that no *separate* compensation was paid for the agents' servicing functions, and that commissions therefore *included* payment for policy loan servicing activities. In that regard, respondent urges us to adopt the approach of the Claims Court in *Ohio National Life Insurance Co. v. United States*, 11 Cl. Ct. 477 (1986), affd. per curiam 807 F.2d 1577 (Fed. Cir. 1986). In *Ohio National Life*, the Claims Court denied the taxpayer's allocation of a portion of agents' commissions to investment expense, finding that the commissions were payable exclusively for policy sales. The Claims Court, in reaching its conclusion, relied in part on the fact that some of the agents' contracts provided for a "renewal expense allowance" under the separate subheading of "compensation for

---

[49]In the instant case, petitioner did not allocate any agents' commissions to investment expenses in its annual statement. However, the court in *Liberty Life Insurance Co. v. United States*, 594 F.2d 21, 25 (4th Cir. 1979), also held that the standards of the NAIC used in completing the annual statement do not control substantive questions of allocation between investment and underwriting expense. We agree. See *Union Central Life Insurance Co. v. Commissioner*, 77 T.C. 845, 865 (1981), revd. on other grounds 720 F.2d 420 (6th Cir. 1983), on remand 84 T.C. 361 (1985).

[50]*Liberty Life Insurance Co. v. United States*, 40 AFTR 2d par. 77-5164 at 77-5576, 76-2 USTC par. 9646 at 85,037 (D.S.C. 1977), affd. 594 F.2d 21 (4th Cir. 1979).

[51]*Liberty Life Insurance Co. v. United States*, 594 F.2d at 24.

servicing of policies of agency," and found that *other* agents were compensated for their policy servicing activities with insurance and pension plan benefits.

We find *Ohio National Life* distinguishable from the instant case because none of petitioner's contracts with its agents contained provisions referring to compensation for servicing activities. Contrary to the Claims Court's findings in *Ohio National Life,* we do not find that pension and insurance benefits served as the compensation for the agents' servicing activities; there is no evidence of such linkage in the instant case, and such benefits were provided by petitioner only to agents meeting minimum production requirements unrelated to servicing activities. Moreover, we do not find that the partial expense reimbursement allowance provided by petitioner served as the compensation for agents' servicing activities. Finally, as emphasized in the above quote from *Liberty Life,* the Fourth Circuit held that a taxpayer's "intent" in making a payment does not control his ability to allocate a portion of such expense against investment income. 594 F.2d at 25. As stated in T. Nash, Federal Taxation of Life Insurance Companies 31-5 (1983), "Since a policy loan earns interest, it is an investment item and the expenses attributable to it should be charged to the investment area." Based upon the foregoing, we hold that petitioner was entitled to assign a portion of agents' commissions to investment expenses.

Having decided the question of whether any of the agents' commissions may be assigned to investment expenses, we next inquire into the proper method for making the assignment. Petitioner would have us look past the policy loan activities of its agents in determining the commissions "fairly chargeable"[52] against investment income. Specifically, petitioner contends that commissions were an acquisition and maintenance cost of the policies, pointing to the policies' production of both investment income and underwriting income for petitioner. Petitioner also presents evidence that insurance policies are priced based on both the underwriting income and the investment income to be earned therefrom. On such grounds, petitioner argues for its claimed allocation of agents' commissions

---

[52]Sec. 1.804-4(b)(1)(i), Income Tax Regs.

against investment income (based on the ratio of total investment income from ordinary policies to total income, including premium income, from such policies). We do not agree with petitioner's position.

Section 804(c)(1) and the relevant regulations[53] clearly contemplate two main categories of insurance company functions; namely, investment and underwriting. The primary function of petitioner's agents was to generate premiums, which clearly fall into the *underwriting* category. Petitioner would have us negate the distinction between the two categories by transmuting a premium-generating expense into an investment expense simply because premiums are the capital that is invested by an insurance company. Under petitioner's reasoning, moreover, not only commissions, but any other expense aimed at the generation of premiums, potentially would be classifiable in part as an investment expense. While the use of an allocation ratio based on a comparison of total investment income to total income may be appropriate where the expense in question is not susceptible of more appropriate allocation,[54] it cannot withstand scrutiny in the case of agents' commissions.

Petitioner basically concedes that the only investment-oriented activities of its agents were policy loan activities. The notion that agents' commissions may be allocated to investment expenses to the extent that they relate to policy loan services of the agents is also indicated in several insurance treatises. See Ernst & Whinney, Federal Income Taxation of Life Insurance Companies 10-18 to 10-20.2 (2d ed. 1989); T. Nash, *supra* at 8-54; G. Lenrow, R. Milo, & A. Rua, Federal Income Taxation of Insurance Companies 278 (3d ed. 1979); D. Van Mieghem & T. Brown, Federal Taxation of Insurance Companies 421 (1986).[55]

---

[53]Sec. 1.804-4(b)(1), Income Tax Regs.

[54]See *Union Central Life Insurance Co. v. Commissioner,* 77 T.C. at 864-865 (upholding allocation method based on ratio of gross investment income to total gross income for franchise tax paid for privilege of doing business, although reversed by the Sixth Circuit on threshold issue of whether any allocation should be allowed if expense is not direct); *Lutheran Mutual Life Insurance Co. v. United States,* 816 F.2d 376 (8th Cir. 1987) (affirming District Court's finding that allocation of State taxes based on ratio of investment income to total income was reasonable).

[55]We note that the Sixth Circuit in *Union Central Life Insurance Co. v. Commissioner,* 720 F.2d 420 (6th Cir. 1983), revg. 77 T.C. 845 (1981), on remand 84 T.C. 361 (1985), has held that general expenses must have a *direct* relationship to the *production* of investment income before they may be allocated to an insurance company's investment function. Applying the Sixth Circuit's mandate in that case, we held on remand that a State franchise tax which

Petitioner alternatively argues that (if the allocation method claimed in its return is denied) commissions should be treated as investment expenses based on the *percentage of time* spent by its agents on policy loan-related functions. In *Liberty Life*, the District Court focused on the amount of time spent by agents in servicing policy loans in upholding the taxpayer's allocation of commissions (equal to a fixed dollar amount per loan) to investment income. The District Court noted the results of a time study by the taxpayer (conducted subsequent to the year in issue in *Liberty Life*) which indicated that 5 percent of its field representatives' time was spent in making and servicing policy loans. *Liberty Life Insurance Co. v. United States*, 40 AFTR 2d par. 77-5164 at 77-5576 to 77-5577, 76-2 USTC par. 9646 at 85,037 (D.S.C. 1977), affd. 594 F.2d 21 (4th Cir. 1979). In *Union Central Life Insurance Co. v. Commissioner*, 77 T.C. 845, 864-865 (1981), revd.[56] 720 F.2d 420 (6th Cir. 1983), on remand 84 T.C. 361 (1985), we noted that "Neither the Code nor the regulations under section 804 prescribe the manner by which general expenses are to be apportioned between the investment and underwriting departments of a life insurance company," and focused on the allocation methods suggested by commentators while noting that we are not obligated to use them. The treatise quoted in *Union Central* states that "a portion of agents' commissions may be allocable to investment expenses on the basis of time spent

merely *permits* a life insurance company to engage in a business activity may not be allocated to investment expenses and is distinguishable from expenses incurred in the actual *production* of investment income. In the opinion that was reversed, we had held a portion of the franchise tax to be allocable to investment expenses because the taxpayer's business in the State to which the franchise tax was paid consisted of both investment and insurance operations, and the tax was levied on income from both sources. In the instant case, we need not decide whether to adopt the Sixth Circuit's standard for allocation to investment expenses because the allocation of commissions related to policy loans is supported under either standard. Moreover, even under the standard articulated in our original *Union Central* holding, the allocation claimed by petitioner in its return would not withstand scrutiny. See also *Liberty National Life Insurance Co. v. United States*, 816 F.2d 1520, 1524 (11th Cir. 1987) (declining to decide whether Sixth Circuit standard is appropriate); *Lutheran Mutual Life Insurance Co. v. United States*, *supra* (treating tax paid for privilege of doing business as general expense allocable in part to investment expenses without noting inconsistency of Sixth Circuit standard); *Liberty Life Insurance Co. v. United States*, 594 F.2d 21, 24 (4th Cir. 1979) (noting in dicta that a tax paid for the privilege of doing business in a State might be apportionable to the company's investment department).

[56] This Court was reversed by the Sixth Circuit on the threshold issue of whether *any* expense should be allocated if it is not "directly related to the production of investment income." Thus, the Sixth Circuit did not address the question regarding the proper method of allocation.

in explaining and processing policy loans," and refers to the use of a ratio of time spent on investment activities to time spent on all activities, for the allocation of certain salaries. Lenrow, Milo, & Rua, *supra* at 278-279. Another treatise similarly suggests the use of a "time or cost study" for the allocation of commissions to policy loan "investment assets." Ernst & Whinney, *supra* at 10-20.2. Thus, we agree with petitioner that a time survey with respect to policy loan activity represents one appropriate method of allocating agents' commissions to investment income.[57]

Petitioner offers the results of two surveys of the time spent by its agents on loan-related activities; one, the 1977 survey described above in our findings of fact, and the other, a 1988 survey (the 1988 survey) detailed in an expert report prepared for the instant litigation. Respondent objects to the introduction of the 1977 survey into evidence on the basis of hearsay, and objects to the use of its results in petitioner's expert report.

We agree with respondent that the 1977 survey is flawed in several respects. First, the surveyed agents were petitioner's "highest producers" in total premium income and admittedly were more likely to engage in minimum deposit policy sales than the average agent. Such a "skew" towards agents likely to engage in loan activities was exacerbated by the "weighing" of the results of one of the questions by reference to the volume of renewal commissions received by the agent. Second, the cover memorandum issued to office managers and supervisors indicates that the surveyed agents may have been informed of the tax-oriented purpose of the survey and of the preferability of high responses to questions about the percentage of time spent on policy

---

[57]One of respondent's experts, Mr. Clint E. Edwards, submitted a report indicating that first year commissions are not allocable against investment income at all and that renewal commissions are allocable to policyholder servicing functions only to the extent of the percentage paid for nonvested "persistency bonuses." Mr. Edwards' report suggests treating the persistency bonus percentage as allocable to *all* servicing functions, and then performing a time study to determine the percentage of servicing time devoted to policy loans. We reject Mr. Edwards' view, as the evidence indicates that the *selling* activities for which large first year commissions were paid generated policy loans. We also note our agreement with petitioner that *Liberty Life* does not suggest that only *renewal* commissions may be allocated in part to investment expenses. Moreover, the fact that "persistency bonuses" were paid only to those agents who remained under contract with petitioner does not establish that such bonuses represented the total compensation allocable to servicing activities.

We also considered respondent's other expert report, prepared by Mr. Arthur C. Eddy, and do not find it persuasive.

loans. While petitioner's expert concluded that such bias in favor of high responses was "probably cancelled out" by a competing bias (namely, petitioner's encouragement of "full premium" business), such "cancelling" of biases does not convince us that the 1977 survey was completely objective. Third, the 1977 survey was designed by employees of petitioner rather than by survey experts.

In *Lutheran Mutual Life Insurance Co. v. United States,* 816 F.2d 376 (8th Cir. 1987), the Eighth Circuit considered a virtually identical scenario, involving a survey of the time agents spent on policy loan matters. In commenting on the apparent exclusion of the survey from evidence by the District Court, the Eighth Circuit stated:

> To establish the trustworthiness of a survey, it must be shown (1) that a proper "universe" was examined and a representative sample was chosen; (2) that the persons conducting the survey were experts; (3) that the data were properly gathered and accurately reported; (4) that the sample design, the questionnaires, and the manner of interviewing met the standards of objective surveying statistical techniques; and (5) that the interviewers, as well as the respondents, were unaware of the purpose of the survey. [816 F.2d at 378; citations omitted.]

While agreeing that the survey failed the above requirements in light of flaws similar to those present here (including the fact that only *full-time* agents were surveyed, that the survey was conducted by an employee, and that some participants probably knew its purpose), the Eighth Circuit stated that "a less stringent application of generally accepted sampling techniques might well have been applied by the trial court" and that the Circuit Court *itself* "might have been inclined to accept the results of the survey, applying a little Kentucky windage to compensate for [its] empirical inadequacies." *Lutheran Mutual Life Insurance Co. v. United States, supra* at 379. In the instant case, we believe that the most appropriate course of action is to admit the 1977 survey into evidence while giving due regard to its empirical inadequacies in evaluating its weight. See Fed. R. Evid. 803(24) (favoring admission of evidence "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts"). In that regard, we note that an expert in insurance company statistics (the author of petitioner's

expert report described below) evaluated the results of the 1977 survey and found that the distribution of responses was reasonable, with a considerable number of "zero" responses to the question of sales time devoted to policy loan features.

Petitioner also submitted the results of the 1988 survey as part of an expert report. While the author of that expert report concededly is an expert in statistics, the 1988 survey suffers from one of the same flaws as the 1977 survey, namely, the use of a sampling of agents not representative of a cross section of all agents. On cross-examination, petitioner's expert confirmed that the agents surveyed by his organization were members of petitioner's "presidents' club" and "directors' club" and represented top producing, more experienced agents. He also stated in that regard that "The relatively new agents I don't think would have been involved in policy loan activities very much." The results of the 1988 survey therefore were skewed in favor of agents engaged in higher than average loan activity.

Petitioner's expert report also suffered from additional flaws, most notably its reliance on the results of the 1977 survey in drawing a conclusion with respect to the year in issue. While the report noted two independent studies as "a backdrop against which to evaluate Phoenix Mutual's [1977] study," the responses in those studies apparently included "servicing activities" other than policy loan activities, and the populations surveyed included only members of the National Association of Life Underwriters, who are typically more experienced agents.

Petitioner's expert report presents the following chart summarizing the 1988 survey and the 1977 survey:

*Percent of time devoted to investments and policy loans in:*

| Year of study | Sales presentation | Service |
|---|---|---|
| 1988 | 13% | 7% |
| 1977 | 17 | 19 |

The report concludes by stating that: "My best estimate of the 1980 percentages would be that they are between the 1980 [sic] and 1977 figures, and probably closer to the 1977 figures than the 1988 figures since the tax situation was more similar to 1977 than to 1988." Based on that

conclusion, petitioner argues for an allocation to investment expense of 17 percent of first-year commissions and 19 percent of renewal commissions paid during the year in issue.

While we rejected petitioner's allocation of commissions based on the ratio of *total* investment income from ordinary policies to total income from the policies, we note that the ratio of *policy loan interest* from the policies to total income from the policies is equal to approximately 8 percent. Because policy loan interest was the category of investment income generated by the agents, we think that ratio would be more appropriate to consider, if any income ratio is an appropriate method of making the proper allocation.

After weighing all of the evidence in the instant case, including the trial testimony of petitioner's agents and the stipulated testimony of other agents, we find that petitioner is entitled to an allocation of some portion of its agents' commissions to the investment function. We, however, do not agree with any of the percentages suggested by petitioner. Therefore, applying our authority under *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930) (see *Lutheran Mutual Life Insurance Co. v. United States, supra* at 379), we hold that petitioner was entitled to treat 13 percent of its first year and renewal commissions on ordinary life insurance policies, or $4,249,651, as an investment expense for the year in issue.

To reflect the foregoing,

*Decision will be entered under Rule 155.*